**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**Giovaniel Soto-Valentín,** Plaintiff,

v.

**City of Fernandina Beach; Nassau County Sheriff's Office;**

**Melissa W. Nelson,** in her official capacity as State Attorney;

**Beverly D. Collins,** in her individual capacity;

**Chief Mark Foxworth,** in his individual and official capacities;

**Detective Christina Corbitt,** in her individual capacity;

**Captain Freddie Peake,** in his individual capacity;

**Officer J.E. Ennis, Jr.,** in his individual capacity;

**Officer M.S. Mazuryk,** in his individual capacity;

**Detective S. Moreno,** in his individual capacity;

**Officer Jason E. Smith,** in his individual capacity;

**Detective M. Arseneau,** in his individual capacity;

**Jennifer L. Eatmon,** in her individual capacity;

**John Does 1–10,** (unidentified FBPD officers and NCSO jail staff, in their individual capacities);

**Case No. _____**

**JURY TRIAL DEMANDED**

**Jane Does 1–10,** (unidentified FBPD officers and

NCSO jail staff, in their individual capacities),

Defendants.

## CIVIL ACTION COMPLAINT FOR DAMAGES
## UNDER 42 U.S.C. § 1983 AND STATE LAW CLAIMS

### I.    INTRODUCTION AND NATURE OF THE ACTION

1. **Nature of the Case:** This is a civil rights action brought under 42 U.S.C. § 1983 (and related state law claims) arising from the wrongful arrest, malicious prosecution, and nearly nine-month incarceration of Plaintiff **Giovaniel Soto-Valentín** for an alleged sexual battery of a minor that he did not commit. Despite the absence of credible evidence – and indeed the existence of exculpatory DNA evidence proving his innocence – Plaintiff was falsely charged with capital sexual battery, jailed under harsh conditions, and ultimately had all charges dropped. This Complaint seeks to hold accountable those individuals responsible for violating Plaintiff's constitutional rights.

2. **Claims and Relief Sought:** Plaintiff seeks redress for violations of his rights under the **Fourth, Eighth, and Fourteenth Amendments** to the U.S. Constitution, including claims for **false arrest**, **malicious prosecution**, **denial of due process** (fabrication and suppression of evidence), and **cruel and unusual punishment**/unconstitutional conditions of confinement during pretrial detention. Plaintiff also brings pendent **state-law claims** (under Florida law) for negligent investigation and negligent detention practices. He seeks **compensatory damages** for his loss of liberty, emotional distress, reputational harm, and other injuries, as well as **punitive damages** against the

individual wrongdoers. In addition, Plaintiff seeks **declaratory relief** (a ruling that his rights were violated) and **injunctive relief** mandating policy changes and training to prevent similar injustices in the future. Plaintiff further demands an award of attorneys' fees and costs under 42 U.S.C. § 1988.

## II.    JURISDICTION AND VENUE

3.    **Federal Question Jurisdiction:** This Court has original subject-matter jurisdiction over Plaintiff's federal claims pursuant to **28 U.S.C. § 1331** (federal question jurisdiction) and **28 U.S.C. § 1343(a)(3)** (jurisdiction to redress deprivations of civil rights), because Plaintiff's claims arise under the U.S. Constitution and federal law (specifically 42 U.S.C. § 1983).

4.    **Supplemental Jurisdiction (State Law Claims):** This Court has supplemental jurisdiction over Plaintiff's related state-law claims (e.g. negligence) under **28 U.S.C. § 1367(a)**, because those claims form part of the same case or controversy as the federal claims. The state-law claims arise from the same nucleus of operative facts – namely, the wrongful investigation, arrest, and detention of Plaintiff – such that they are reasonably tried together with the federal causes of action.

5.    **Venue:** Venue is proper in the Middle District of Florida, Jacksonville Division, pursuant to **28 U.S.C. § 1391(b)**. The events and omissions giving rise to Plaintiff's claims occurred in Nassau County, Florida, which is within the Jacksonville Division of the Middle District. Moreover, on information and belief, all Defendants reside in the State of Florida, and several Defendants (including the City of Fernandina Beach and Nassau County officials) reside in this District.

## III.    PARTIES

6.    **Plaintiff: Giovaniel Soto-Valentín** is a natural person and a resident of Florida. At all relevant times, Plaintiff lived in Fernandina Beach, Nassau County, Florida. Plaintiff is a 27-year-old man with no prior criminal record. He is the individual who was wrongfully accused and injured by the acts described in this Complaint.

7.    **Defendant City of Fernandina Beach:** The City of Fernandina Beach (the "City") is a Florida municipal corporation. The City operates the **Fernandina Beach Police Department (FBPD)** and is responsible for the training, supervision, and conduct of FBPD officers, detectives, and supervisors. The City is a "person" within the meaning of 42 U.S.C. § 1983 and is sued **for municipal liability** (Monell claim) based on the policies, customs, and failure to train/supervise that led to the violations of Plaintiff's rights, as detailed below.

8.    **Defendant Nassau County Sheriff's Office (NCSO):** The Nassau County Sheriff's Office is the law enforcement agency for Nassau County, Florida, and is responsible for operating the Nassau County Jail and overseeing pretrial detention of arrestees. NCSO (or the Sheriff in his official capacity) is a "person" under 42 U.S.C. § 1983 for purposes of municipal liability. NCSO is sued for maintaining unlawful customs or policies – including **unconstitutional detention practices** and failure to ensure proper treatment of detainees – that contributed to the prolonged and punitive confinement of Plaintiff. NCSO is also sued under Florida law (via **Fla. Stat. § 768.28**) for the negligence of its employees in managing Plaintiff's detention.

9.    **Defendant Melissa W. Nelson:** Melissa Nelson is the State Attorney for Florida's Fourth Judicial Circuit, which includes Nassau County. She was the elected chief prosecutor at all relevant times. Defendant Nelson is sued in her **official capacity** for

her supervisory role over the actions of her assistant prosecutors. In that capacity, she was responsible for establishing policies and training within the State Attorney's Office, and for supervising prosecutions in Nassau County. Plaintiff alleges that Nelson, as a final policymaker for prosecutions, **failed to prevent or remedy the wrongful prosecution** of Plaintiff and exhibited deliberate indifference to Plaintiff's rights (for example, by allowing the case to proceed despite clear exculpatory evidence). Nelson is sued under § 1983 for injunctive and declaratory relief and for damages to the extent not barred by immunity (no damages are sought from the state entity itself, only from individuals). *(Note: Plaintiff does not sue the "State of Florida" as such, in recognition of Eleventh Amendment immunity; instead, he targets the responsible officials in their individual or official capacities as allowed by law.)*

10. **Defendant Beverly D. Collins:** Beverly Collins is an Assistant State Attorney (ASA) who, at relevant times, was employed in the Nassau County office of the State Attorney. Defendant Collins is sued in her **individual capacity** for acts outside the scope of any prosecutorial immunity – specifically, for **malicious prosecution** of Plaintiff. As alleged herein, Collins, acting under color of state law, filed and pursued grave criminal charges against Plaintiff without probable cause and in the face of evidence of his innocence. She is alleged to have acted with malice or reckless disregard for the truth, which strips any absolute immunity she might otherwise claim (to the extent her actions are found investigatory or administrative in nature). Collins's actions directly caused Plaintiff to suffer a deprivation of liberty for which she is liable under § 1983.

11. **Defendant Chief Mark Foxworth:** Mark Foxworth was, at all relevant times, the Chief of Police for the City of Fernandina Beach Police Department (FBPD). He is sued in his **individual capacity** for his role in the events (including as a supervisor who approved or permitted the constitutional violations by his subordinates) and in his **official capacity** as a policymaker for the City/FBPD. As Chief, Foxworth had ultimate responsibility for FBPD's training and investigative procedures. Plaintiff alleges that Chief Foxworth knew or should have known of the deficient investigation and lack of probable cause against Plaintiff but failed to intervene. Chief Foxworth also promulgated or allowed the customs/practices that led to Plaintiff's wrongful arrest and is thus a key figure in the Monell claim against the City.

12. **Defendant Detective Christina Corbitt:** Christina Corbitt was a Detective with the Fernandina Beach Police Department who served as the lead investigator on the case against Plaintiff. She is sued in her **individual capacity**. Detective Corbitt was the affiant on the probable cause affidavit and primary officer handling the sexual assault investigation. As detailed below, Corbitt is alleged to have **targeted Plaintiff without corroboration, fabricated or embellished evidence to establish probable cause, and disregarded exculpatory evidence** (such as DNA results clearing Plaintiff). She played a central role in Plaintiff's false arrest and the continuation of charges against him, making her liable under § 1983 for multiple constitutional violations.

13. **Defendant Captain Freddie Peake:** Freddie "F." Peake was, at relevant times, a Captain or Police Commander in the FBPD Investigations Division (and is now believed to serve in a command role at FBPD)fbfl.us. He is sued in his **individual capacity**. Captain Peake reviewed and approved Detective Corbitt's probable cause

6

affidavit on or about September 2, 2021, despite the lack of reliable evidence implicating Plaintiff. Peake thereby authorized Plaintiff's arrest. He is alleged to have **knowingly sanctioned an arrest without probable cause** and failed to supervise the investigation properly, contributing to the violations of Plaintiff's Fourth Amendment rights.

14. **Defendant Officer J.E. Ennis, Jr.:** Officer J.E. Ennis Jr. (first name currently unknown, hereinafter "Officer Ennis") was a law enforcement officer with FBPD who was one of the initial responding or reporting officers on August 28, 2021. On the night of the incident, Officer Ennis responded to the hospital where the child was being examined and took an initial report from the victim's parents. He collected physical evidence (a napkin with possible fluid) and then handed off the investigation to Detective Corbitt that night. Officer Ennis is sued in his **individual capacity** for his role in the **false arrest** and **investigation** – including any negligent or reckless failure to pursue other leads and his collaboration in the faulty probable cause determination that led to Plaintiff's arrest. (Badge/ID P1812 corresponds to Officer Ennis.)

15. **Defendant Officer M.S. Mazuryk:** M.S. Mazuryk (first name unknown) was an officer or detective with FBPD (ID #327) who participated in the investigation or arrest of Plaintiff. On information and belief, Officer Mazuryk assisted Detective Corbitt during the post-incident investigation. He was served with a deposition subpoena during Plaintiff's criminal case, indicating his involvement. Officer Mazuryk is sued in his **individual capacity** for participating in **Plaintiff's arrest and prosecution without probable cause**, and for any **fabrication or omission of evidence** to wrongfully inculpate Plaintiff.

16. **Defendant Detective S. Moreno:** S. Moreno was a detective with FBPD who took part in the investigation of the alleged assault. Detective Moreno is bilingual and assisted by **translating interviews** with the victim's family (who are Spanish-speaking). He conducted a recorded interview with the victim's father, Mr. Castro-Arias, on August 28, 2021, acting as translator, and another follow-up interview on August 31, 2021. In these roles, Detective Moreno was aware of critical facts, including the victim's initial inconsistent statements and the mention of **another male individual ("Gerardo") in a black shirt** who could have been a suspect. Despite this, FBPD (including Moreno) **zeroed in on Plaintiff**. Detective Moreno is sued in his **individual capacity** for **failing to conduct a fair investigation** and for helping to advance charges against Plaintiff without probable cause (e.g. by not disclosing exculpatory aspects of witness statements, thereby violating Plaintiff's rights).

17. **Defendant Officer Jason E. Smith:** Jason Smith was, on information and belief, a police officer or detective with FBPD who had supervisory involvement in the case. Officer Smith reviewed and signed off on the initial incident report prepared by Officer Ennis on August 29, 2021. He may also have participated in aspects of the investigation or decision-making. Officer **Smith is sued in his individual capacity** for his role in **approving or condoning the deficient probable cause for Plaintiff's arrest**. By failing to object to or correct the lack of evidence against Plaintiff, Smith contributed to the violation of Plaintiff's Fourth Amendment rights.

18. **Defendant Detective M. Arseneau:** M. Arseneau (first name unknown) was a detective with FBPD who became involved in the investigation by administering a **photographic lineup**. After the incident, Detective Arseneau showed the victim's

father a photo array which included Plaintiff's photo, and the father identified Plaintiff (who he had seen at the gathering). Detective Arseneau is sued in his **individual capacity** for **conducting an unduly suggestive or biased identification procedure** and for otherwise assisting in the fabrication of a case against Plaintiff without due diligence. His actions reinforced the wrongful accusation and helped provide cover for the arrest, implicating him in the ensuing constitutional violations.

19. **Defendant Jennifer L. Eatmon:** Jennifer Eatmon is a crime laboratory analyst employed by the Florida Department of Law Enforcement (FDLE). She conducted or supervised the DNA analysis of the biological evidence in this case. The FDLE lab report dated November 23, 2021, which Ms. Eatmon was responsible for, **conclusively excluded Plaintiff as the source of male DNA** found on the victim's clothing. Despite this exculpatory result, Ms. Eatmon did not ensure immediate communication of these findings in a way that prevented Plaintiff's continued detention. She is sued in her **individual capacity** under § 1983 for **failing to promptly report and emphasize exculpatory evidence** (to the extent her actions or inactions contributed to the violation of Plaintiff's rights). While lab analysts are generally neutral scientists, Plaintiff alleges that Eatmon's handling of the evidence (e.g., any delay or lack of clarity in reporting the exclusion) allowed the prosecution to persist in violation of due process. This claim will be further supported by evidence of her communications with law enforcement and prosecutors.

20. **Defendants John and Jane Does 1–10:** John Doe(s) 1–10 and Jane Doe(s) 1–10 are presently unknown individuals who were employed by either FBPD or the Nassau County Sheriff's Office and who participated in the acts complained of. These Doe

Defendants include, for example, other officers or supervisors who aided in the investigation/arrest (John Does), as well as jail staff and supervisors who oversaw Plaintiff's confinement (John/Jane Does, NCSO). They are sued in their **individual capacities**. Plaintiff will seek to identify these individuals in discovery and amend the Complaint to name them. Each Doe Defendant, acting under color of state law, is responsible for one or more violations of Plaintiff's constitutional rights as described in the factual allegations and counts below.

21. **At all relevant times**, each of the individual Defendants named above was acting under **color of state law** – i.e., under the authority of their positions as officers, deputies, prosecutors, or employees of governmental agencies in Florida. Additionally, each was acting within the scope of his or her employment with the relevant municipal or state agency, except where otherwise noted. The unlawful acts detailed in this Complaint therefore implicate the liability of the governmental entities as well as the individuals.

### IV.    FACTUAL BACKGROUND

**A.  The Family Gathering and Alleged Incident**

22. On **August 28, 2021**, a birthday party was held at **530 A Division Street, Fernandina Beach, Florida 32034**, the residence of **Leonardo Mejía** and **Vilma Rodriguez**, Plaintiff's father-in-law and mother-in-law. Plaintiff resided at that residence with his wife, **Karla Mejía**, and his mother, **Daira Soto**.

23. The celebration was a large family gathering, attended by nearly all of Plaintiff's immediate family, along with friends, neighbors, and other community members. The alleged victim, a five-year-old minor identified herein as **J.C.**, was present with her

parents, **Jose Castro-Arias** and **Cecia Castro**, who were members of a local Protestant church.

24. Plaintiff himself was working at **The Lakeside at Amelia Island** that evening. His timecard confirmed that he clocked out of work at approximately **7:15 p.m.**, establishing that he was not at the residence during the critical timeframe when the alleged assault was said to have occurred.

25. Before re-entering his residence, Plaintiff was asked by **Armando Guevara**, another attendee, to accompany him briefly to another location. Plaintiff agreed. When he returned, the alleged incident had already transpired, and he was not present when the victim claimed the assault occurred.

26. During the gathering, a **large food table collapsed**, distracting the adults present. In this moment of commotion, J.C. left the common area and went into the bathroom alone. It is alleged that during this period, an assailant entered the bathroom and assaulted her.

27. Witness testimony later established that another male guest, known only as **"John Doe"** at the time, asked to use the bathroom but found it already occupied, presumably by J.C., around the same timeframe as the alleged incident. Despite fitting the description given by the victim, Gerardo was never properly investigated or tested for DNA.

**B. Forensic Evidence and Exoneration**

28. The **Florida Department of Law Enforcement (FDLE)** processed the physical evidence collected, including the child's underwear and swabs of biological fluid. On **November 23, 2021**, FDLE issued a forensic report confirming that a **male DNA**

**profile was recovered from the underwear**—and **Plaintiff was conclusively excluded as a contributor**.

29.    Further swabs taken from the child's body (vaginal, anal, and thigh) yielded no identifiable male DNA. The only male DNA identified belonged to someone other than Plaintiff, establishing that he could not have been the perpetrator.

30.    To further affirm his innocence, Plaintiff voluntarily submitted on **June 3, 2022** to a **federally certified polygraph examination** administered by a retired FBI polygraph examiner. The results indicated **"No Deception Indicated,"** confirming Plaintiff's truthful denial of the allegations.

## C.  Flawed Investigation and Targeting of Plaintiff

31.    Despite the presence of over **13 adults and 9 children** at the gathering who could have served as potential witnesses, Fernandina Beach Police Department (FBPD) detectives conducted a **deeply flawed and incomplete investigation**. Critical witnesses were never interviewed, alternative suspects were ignored, and exculpatory evidence was disregarded.

32.    Investigators quickly targeted Plaintiff as the sole suspect, even though the victim admitted she was **approached from behind** and **did not see the assailant's face**. Nevertheless, Plaintiff was identified as the culprit solely because he wore a **black shirt**, a description that also applied to at least one other adult male present.

33.    Despite multiple men at the party, FBPD officers subjected only Plaintiff to DNA testing. The others, including Gerardo—who fit the victim's description—were never tested.

34. **Biased Investigation Targeting Plaintiff:** FBPD officers responded to the hospital later that night. Rather than conducting a broad, neutral investigation, officers prematurely and improperly focused on Plaintiff after the victim, when prompted, pointed to him as someone "wearing a black shirt" who allegedly followed her into the bathroom. Detective **Christina Corbitt** and Captain **Freddie Peake** locked onto this theory, assuming Plaintiff's guilt despite multiple inconsistencies. The victim initially claimed a **female entered the bathroom**, later changed her story to a male, and two male guests—including Gerardo—fit that description. Nonetheless, FBPD ignored exculpatory evidence and pursued Plaintiff while failing to question others.

35. **Fabrication of Probable Cause:** On **September 2, 2021**, Detective Corbitt submitted a probable cause affidavit approved by Captain Peake. The affidavit falsely asserted there was probable cause to believe Plaintiff committed the offense, citing the victim's statements and medical observations, while **omitting contradictory facts** and pending DNA results. It included speculative interpretations (such as a doctor's belief that a stain "was semen") as if they were conclusive findings. This **manipulated presentation** misled the magistrate into issuing a warrant, resulting in Plaintiff's wrongful arrest.

36. **Exculpatory DNA Evidence Ignored:** Despite the FDLE's scientific findings that **excluded Plaintiff**, FBPD and the State Attorney's Office continued to pursue charges. They deliberately downplayed or suppressed the DNA results, clinging to a case already discredited by science.

37. **Formal Charge and Excessive Bail:** On **September 23, 2021**—even before the DNA results were available—Assistant State Attorney **Beverly Collins**, under the authority

of State Attorney **Melissa Nelson**, filed a formal Information charging Plaintiff with **Capital Sexual Battery**, a life felony under Fla. Stat. § 794.011(2)(a). The court, relying on the seriousness of the charge, imposed a **$750,000 bond**, an amount Plaintiff could not possibly pay. He was forced into pretrial detention.

### D. Detention and Mistreatment of Plaintiff in Jail

27. **Solitary Confinement and Unsafe Conditions:** Following his arrest, Plaintiff was confined in the Nassau County Jail. Officials immediately placed him in **solitary confinement ("protective custody")**, subjecting him to 23-hour lockdowns in small, unsanitary cells. During limited out-of-cell time, he was exposed to violent inmates who threatened him because of the nature of the charge.

28. **Harassment and Deprivation by Jail Staff:** Jail staff, aware of the charge against Plaintiff, **harassed and taunted him**. Deputies sometimes **denied food, water, and showers**, or provided inedible meals. When Plaintiff reported threats from other inmates, guards responded with indifference or ridicule, effectively condoning the unsafe conditions.

29. **Continued Detention Despite Exonerating Evidence:** By late November 2021, the **FDLE DNA report** conclusively cleared Plaintiff. Counsel even filed a **motion to modify bond** citing these results. Yet prosecutors did not dismiss the case, and jailers took no steps to advocate for Plaintiff's release. He remained incarcerated for nearly seven additional months after exculpatory evidence was available, underscoring the **deliberate indifference** of both prosecutorial and jail officials.

### E. Dismissal of Charges and Plaintiff's Injuries

30. **Nolle Prosequi:** On **June 22, 2022**, the State Attorney's Office finally entered a **nolle prosequi**, dismissing all charges. By then, Plaintiff had endured almost **300 days in jail** for a crime he did not commit.

31. **Loss of Liberty, Livelihood, and Reputation:** Plaintiff lost his job, income, and financial stability. His vehicle was repossessed, debts mounted, and he faced **public humiliation and ostracism** in his community. Being falsely branded as a child rapist inflicted lasting reputational damage.

32. **Ongoing Effects and Need for Reform:** Plaintiff continues to suffer from anxiety, depression, nightmares, and post-traumatic stress caused by his wrongful arrest and confinement. His family relationships remain strained. This case highlights systemic failures in both police investigation and prosecutorial oversight. Plaintiff seeks not only damages, but also reforms to ensure that **innocent people are not again subjected to this kind of injustice**.

## V.    CAUSES OF ACTION

*(Each count below incorporates by reference the factual allegations previously set forth. Each count is asserted under 42 U.S.C. § 1983 against the specifically named Defendants, unless otherwise indicated. All individual Defendants are sued in their personal capacities for damages, and any official-capacity claims are for declaratory/injunctive relief or Monell liability as noted.)*

### Count I – False Arrest and Unlawful Seizure

**42 U.S.C. § 1983 – Violation of the Fourth Amendment** (Against Defendants Corbitt, Peake, Ennis, Mazuryk, Moreno, Smith, Arseneau, and Eatmon)

33. **Incorporation of Facts:** Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

34. **Arrest Lacked Probable Cause:** The Fourth Amendment, applicable to the states through the Fourteenth Amendment, guarantees citizens the right to be free from unreasonable seizures, including arrest without probable cause. Defendants **Detective Christina Corbitt, Captain Freddie Peake, Officer J.E. Ennis Jr., Officer M.S. Mazuryk, Detective S. Moreno, Officer Jason Smith, and Detective M. Arseneau** each caused Plaintiff to be seized (arrested and detained) without probable cause, in violation of his Fourth Amendment rights. These Defendants **deliberately or recklessly misled the judicial officer** who approved the arrest warrant by providing false, exaggerated, or incomplete information. In the arrest affidavit and related reports, they **omitted exculpatory facts and presented unverified assertions as "fact"**, thereby manufacturing the illusion of probable cause. No reasonable officer in their position would have believed probable cause existed to arrest Plaintiff, given the lack of corroborating evidence and the pending forensic results.

35. **Individual Liability of Officers:** Detective Corbitt drafted, and Captain Peake approved, the primary probable cause affidavit that led to Plaintiff's arrest. Officer Ennis initiated the chain by reporting the accusation and handing the case over without noting obvious inconsistencies. Detectives Moreno and Arseneau contributed by translating interviews and conducting photo lineups in a manner that confirmed a preconceived notion of Plaintiff's guilt, rather than objectively assessing evidence. Officer Smith, as a reviewing supervisor, signed off on the arrest despite glaring gaps in evidence. Officer Mazuryk assisted in the investigation/arrest procedures, helping execute the baseless seizure of Plaintiff. By their actions, each of these Defendants

16

directly participated in or set in motion Plaintiff's warrantless (and then post-warrant) arrest and detention without lawful justification.

36. **Role of Defendant Eatmon (FDLE Analyst):** Defendant Jennifer L. Eatmon, while not an arresting officer, acted under color of state law as an FDLE forensic analyst. Upon completing DNA analysis that excluded Plaintiff as a contributor, she owed a duty to accurately and promptly report those exculpatory results. To the extent that Ms. Eatmon **delayed or failed to clearly communicate the DNA findings** (or acquiesced in any mischaracterization of them by law enforcement), she contributed to the continuation of Plaintiff's unlawful seizure. For example, if Ms. Eatmon had immediately highlighted to investigators and prosecutors that the DNA **ruled out** Plaintiff, any continued detention after November 23, 2021 lacked probable cause. Thus, her potential negligence or misconduct in handling the evidence can render her liable for **prolonging Plaintiff's unlawful seizure** beyond the point when scientific evidence had negated any probable cause.

37. **Damages and Causation:** As a **direct and proximate result** of the actions of Defendants Corbitt, Peake, Ennis, Mazuryk, Moreno, Smith, Arseneau, and (to the extent applicable) Eatmon, Plaintiff was wrongfully arrested and detained, causing him to suffer the injuries described above, including loss of liberty, emotional distress, and reputational harm. Plaintiff was jailed for months based on a **false arrest**, which entitles him to compensation for every day of freedom lost.

38. **Malice and Reckless Disregard – Punitive Damages:** The conduct of the above-named Defendants was **intentional, willful, and done with reckless disregard** for Plaintiff's constitutional rights. These officers ignored obvious signs of Plaintiff's

innocence and fabricated a case against him, behavior that is egregious and merits punishment. Accordingly, in addition to compensatory damages, Plaintiff seeks **punitive damages** against the individual Defendants under this Count, to deter such flagrant abuses of authority in the future.

### Count II – Malicious Prosecution

**42 U.S.C. § 1983 – Violation of Fourth and Fourteenth Amendments**
(Against Defendants Collins, Nelson, Corbitt, Peake, Ennis, Mazuryk,
Moreno, Smith, and Arseneau)

39. **Incorporation of Facts:** Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

40. **Constitutional Malicious Prosecution Claim:** The Fourth Amendment (as applied to the states) protects individuals not only from unjustified arrest but also from **malicious prosecution** – the wrongful continuation of criminal charges without probable cause. In this case, Defendants **initiated and continued criminal proceedings** against Plaintiff with malice and without probable cause, thereby violating Plaintiff's Fourth Amendment rights and the procedural due process guarantees of the Fourteenth Amendment (to the extent a liberty deprivation continued post-arraignment). Specifically, the malicious prosecution claim under § 1983 requires: (a) the initiation of charges, (b) without probable cause, (c) with malice, and (d) termination of the proceedings in Plaintiff's favor. All these elements are satisfied here.

41. **Role of ASA Beverly Collins:** Defendant Beverly D. Collins, acting under color of state law in her capacity as an Assistant State Attorney, **initiated formal charges** against Plaintiff by filing the Information on September 23, 2021, accusing Plaintiff of capital sexual battery. At the time she filed this charge, **probable cause was lacking**:

the only evidence was the uncorroborated accusation of a five-year-old (with inconsistencies in her story) and preliminary observations pending lab confirmation. In fact, by the time the prosecution was in full swing, DNA evidence had emerged disproving the allegation. Yet Collins **continued to prosecute** the case for months thereafter. Her actions were taken with at least **reckless disregard for the truth**, if not outright malice, as evidenced by the decision to press forward despite scientific proof of innocence. **No objectively reasonable prosecutor** would have persisted with the case under these circumstances. Collins' conduct, therefore, constitutes malicious prosecution in violation of the Fourth Amendment (the unlawful seizure of Plaintiff via legal process) and the Fourteenth Amendment (denial of liberty without due process). Collins is **liable in her individual capacity**, as malicious prosecution is outside the scope of her absolute immunity when predicated on bad faith or perversion of her role (which we allege here).

42. **Role of State Attorney Nelson:** Defendant Melissa W. Nelson, as the State Attorney (and a supervising official), is also responsible for the malicious prosecution. While Nelson did not personally sign the Information, it was filed in her name and authority, and she oversaw the office that prosecuted Plaintiff. Nelson **failed to supervise or intervene** despite the evident lack of probable cause. As a policymaker, she allowed a case with no merit to proceed, reflecting at least **gross negligence or deliberate indifference** to Plaintiff's rights. If Nelson or her office had proper training and oversight, the prosecution would have been halted as soon as exculpatory evidence surfaced. Instead, the case languished until June 2022. Nelson is sued in her official capacity, and this Count supports prospective relief and underscores her office's role

in the harm to Plaintiff. (No monetary damages are sought against Nelson in her official capacity beyond what Monell liability allows, due to Eleventh Amendment constraints, but her actions are noted as part of the continuum of malicious prosecution by state actors.)

43.   **Role of FBPD Officer Defendants:** Defendants Corbitt, Peake, Ennis, Mazuryk, Moreno, Smith, and Arseneau each **participated in and influenced the decision to prosecute** Plaintiff by providing false information, concealing exculpatory evidence, or otherwise encouraging the State to charge Plaintiff. In a malicious prosecution claim, these officers can be liable if they **instigated or caused the commencement or continuation of criminal proceedings** against Plaintiff with malice and without probable cause. As described earlier, Detective Corbitt's flawed affidavit set the prosecutorial process in motion; Captain Peake's approval gave it official weight; Officers Ennis, Mazuryk, Smith, etc., all bolstered the case by their reports or testimony; and Detective Moreno and Arseneau provided "evidence" (through interviews and photo ID) that was used to justify continuing the case. All the while, they **knew or should have known** that Plaintiff was likely innocent (especially once DNA results were in). Their collective actions were done **willfully and in bad faith**, leading to Plaintiff's malicious prosecution. Each is liable under § 1983 for the damages arising from the continuation of charges against Plaintiff absent probable cause.

44.   **Favorable Termination of Charges:** The criminal case against Plaintiff was resolved completely in his favor. On June 22, 2022, the State dropped the charges via a **nolle prosequi**, which constitutes a **favorable termination** of the prosecution for purposes

of a malicious prosecution claim. There has been no conviction or adverse finding against Plaintiff; indeed, the charges were abandoned, implicitly acknowledging Plaintiff's innocence. Thus, Plaintiff has satisfied the element of favorable termination required to proceed on this Count.

45. **Damages from Malicious Prosecution:** As a direct result of Defendants' malicious prosecution of Plaintiff, he suffered significant damages. These include the **nine months of wrongful incarceration**, during which Plaintiff lost his freedom and endured severe hardship. He also incurred **financial losses** (legal fees, lost wages, and expenses) in fighting the baseless charges. Furthermore, the prosecution caused immense **emotional pain and reputational injury** – the public accusation wrecked his standing in the community and the stress of a looming life-felony trial caused lasting trauma. Plaintiff's **family life** was disrupted and his career derailed. All of these injuries are attributable to the Defendants who pushed forward with the unfounded case against him.

46. **Malice and Punitive Damages:** The actions of Defendants under this Count were driven by malice, ill-will, or at least a **reckless disregard for Plaintiff's rights and innocence**. The prosecutors had every reason to doubt the case but pressed on, and the officers were more interested in securing a "win" than finding truth. Such conduct is egregious. Therefore, Plaintiff seeks **punitive damages** against the individual-capacity Defendants (Collins, Corbitt, etc.) to punish and deter this type of malicious misuse of the criminal justice system.

**Count III – Denial of Due Process (Fabrication of Evidence and Withholding Exculpatory Evidence)**

**42 U.S.C. § 1983 – Violation of Fourteenth Amendment** (Against Defendants Corbitt, Collins, Nelson, Peake, Ennis, Mazuryk, Moreno, Smith, and Arseneau)

47.  **Incorporation of Facts:** Plaintiff realleges and incorporates all preceding paragraphs of the Complaint as if fully set forth herein.

48.  **Fourteenth Amendment Violations:** The Fourteenth Amendment's Due Process Clause guarantees fundamental fairness and liberty interests, and it forbids state actors from **fabricating evidence** or **withholding material exculpatory evidence** in a manner that results in an unjust deprivation of liberty. In this case, multiple Defendants violated Plaintiff's due process rights by (a) **fabricating or falsifying evidence** to implicate Plaintiff, and (b) **suppressing or failing to disclose exculpatory evidence** (Brady material), thereby resulting in Plaintiff's prolonged detention and prosecution without fundamental fairness. These actions shock the conscience and contravene the concept of ordered liberty.

49.  **Evidence Fabrication by FBPD Detectives:** Defendant **Detective Corbitt**, with the assistance or approval of Defendants **Peake, Ennis, Mazuryk, Moreno, Smith, and Arseneau**, fabricated inculpatory evidence and narratives during the investigation. This includes composing police reports and affidavits that **they knew contained false statements or misrepresentations**. For example, in the probable cause affidavit, Corbitt (and Peake as reviewer) stated that the victim had described Plaintiff committing the act and presented that as fact, omitting that the child had given conflicting descriptions and had to be coached into identifying Plaintiff. The officers also reported that a doctor found evidence "consistent with semen" on the child, implying a connection to Plaintiff, while ignoring that **no lab confirmation existed at**

**that time**. Furthermore, Detective Arseneau's administration of the photo lineup could be seen as an attempt to manufacture identification evidence: the father was effectively guided to confirm Plaintiff's photo, reinforcing a false narrative. All these acts constitute **fabrication of evidence** or at least fabrication of a false impression of guilt. By deliberately generating false evidence and perspectives, these Defendants violated Plaintiff's right to due process. A criminal defendant (or arrestee) has the right not to be **framed** by the police.

50. **Suppression of Exculpatory Evidence (Brady Violations):** Critical exculpatory evidence – most notably the **FDLE DNA lab results excluding Plaintiff** – was **withheld or ignored** by Defendants **Collins** (prosecutor) and the FBPD officers. Under *Brady v. Maryland* and its progeny, a prosecutor has an obligation to disclose material exculpatory evidence to the defense. While the FDLE report was eventually turned over (since defense counsel obviously knew of it and even moved to modify bond on its basis), Defendant Collins effectively **suppressed its significance** by continuing as if the evidence didn't matter. She did not promptly act on the evidence to seek dismissal or even a bond reduction (it was the defense that had to file motions referencing the DNA). This **delayed disclosure/acknowledgment** and the decision to proceed without alerting the court to the evidentiary void violated due process. Similarly, the officer Defendants had a duty to come forward with, or at least not conceal, evidence negating Plaintiff's guilt (such as the existence of another suspect in a black shirt, the victim's initial claim of a female perpetrator, and other witness statements that didn't support the accusation). The police reports given to the State emphasized inculpatory details and **omitted mention of the alternate suspect**

**"Gerardo"** entirely, thus concealing a potentially exonerating lead. This strategic omission and any failure to inform the prosecutor or defense of such information amount to **withholding material exculpatory evidence**, a due process violation attributable to the law enforcement Defendants.

51. **Supervisory Liability of Nelson:** Defendant Melissa Nelson, as head of the State Attorney's Office, is also responsible for the due process violations to the extent that her **failure to train or supervise** her subordinates led to these Brady and evidence-fabrication issues. Nelson knew or should have known that her office was pursuing a case with seriously questionable evidence. A reasonable supervisor would have ensured that prosecutors honor their ethical and constitutional duties to drop cases lacking probable cause, especially in light of clear exculpatory evidence. Nelson's inaction and lack of oversight contributed to Plaintiff being denied due process for an extended period. While Nelson herself may not have handled evidence directly, her **deliberate indifference** to the situation permitted the violations to occur unchecked, which supports her liability in an official/supervisory capacity for purposes of declaratory and injunctive relief (e.g. the need for better training and policies in her office).

52. **Injury and Causation:** The due process violations by Defendants were a proximate cause of Plaintiff's injuries. **Fabricated evidence** was used to justify Plaintiff's arrest and initial detention; without it, there would have been no case. **Suppressed evidence** (like the DNA results) caused Plaintiff's detention to continue far longer than it should have – had all exculpatory info been promptly disclosed and acted upon, Plaintiff might have been freed months earlier. Because of these due process violations, Plaintiff

suffered **prolonged loss of liberty, emotional trauma, and a tainted legal process** that put him at serious risk of wrongful conviction (a risk that hung over him until dismissal). The stress and fear associated with potentially facing life in prison based on false and concealed evidence caused independent emotional harm. Thus, Plaintiff has been directly damaged by the denial of a fair process.

53.   **Conscience-Shocking Conduct – Punitive Damages:** The conduct of the individual Defendants in this Count – fabricating charges against an innocent man and callously ignoring proof of his innocence – **shocks the conscience** and represents a severe abuse of power. Such behavior cannot be tolerated in a society that values justice. Plaintiff therefore seeks **punitive damages** against the responsible individual Defendants (Corbitt, Collins, etc.) to punish them and to send a strong message that due process violations of this nature are abhorrent and will face severe consequences.

**Count IV – Prolonged Detention and Cruel Conditions of Confinement**

**42 U.S.C. § 1983 – Violation of Fourteenth Amendment**
**(and Eighth Amendment standards)** (Against Defendants John/Jane Doe
Jail Officials of NCSO, and other unknown NCSO personnel)

54.   **Incorporation of Facts:** Plaintiff realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

55.   **Constitutional Rights of Pretrial Detainees:** At all times during his custody, Plaintiff was a **pretrial detainee** (never convicted of any offense related to this arrest). His right to humane treatment and to not be punished while awaiting trial is protected by the Fourteenth Amendment's Due Process Clause. (Although convicted prisoners are protected by the Eighth Amendment's Cruel and Unusual Punishments Clause, the standard is similar; pretrial detainees are entitled to at least the same level of protection,

if not greater, under the Fourteenth Amendment.) These rights include: (a) the right not to be detained any longer than necessary when there is no lawful basis (i.e. not to be subjected to prolonged detention without due process), and (b) the right to conditions of confinement that meet basic standards of decency and do not constitute punishment or deliberate indifference to basic needs.

56.    **Prolonged Detention Without Justification:** Defendants **John and Jane Doe jail officials** (names unknown, but including supervisors and decision-makers within the Nassau County Sheriff's Office) violated Plaintiff's rights by keeping him in jail for an unreasonably prolonged period **even after it was clear that the basis for his detention had eroded**. By late November 2021, the evidence underpinning the charge (DNA) was negated, yet these officials took no steps to advocate for Plaintiff's release or even to review whether his continued detention was proper. While jail officials are not judges, they do have an obligation not to **hold detainees in bad faith or in reckless disregard of known innocence**. Here, NCSO officials were aware (or should have been aware) of the exculpatory developments – for instance, the defense motion citing DNA results was presumably served on the jail or came to the jail's attention, and jail staff typically track the status of high-profile detainees. Their **failure to alert the court or prosecutors**, or to take any action, contributed to Plaintiff being **unnecessarily jailed for many additional months**. This inaction amounts to **deliberate indifference** to Plaintiff's due process rights – effectively punishing him by leaving him to languish despite evidence of innocence. The **Fourteenth Amendment** prohibits such arbitrary and unjustified detention.

57. **Inhumane Conditions and Deliberate Indifference:** Moreover, throughout Plaintiff's detention, certain NCSO officers (John/Jane Does) violated his rights by subjecting him to **cruel conditions of confinement**. As detailed earlier, Plaintiff was unnecessarily kept in **isolated confinement**, denied regular access to showers and exercise, and deprived of adequate nutrition at times. The jail officials' conduct – such as ignoring his requests for basic necessities, failing to intervene when he was threatened, and using solitary confinement excessively – demonstrates **deliberate indifference** to Plaintiff's health and safety. Under the Fourteenth Amendment, a pretrial detainee must not be punished or treated with gross negligence. Yet Plaintiff's treatment was **punitive**: there was no legitimate governmental objective served by the extreme isolation or by withholding food/water; it was done out of convenience, prejudice (due to the nature of his charge), or neglect. This violates the standard set by the Supreme Court that conditions of confinement for pretrial detainees must be reasonably related to a legitimate purpose and not tantamount to punishment. Here, the conditions were so extreme and the indifference so apparent that they amounted to **unconstitutional punishment** of an innocent-until-proven-guilty individual.

58. **Liability of Jail Personnel:** The specific John/Jane Doe Defendants liable under this Count include, but are not limited to: the jail commander or warden responsible for inmate housing assignments (who chose to keep Plaintiff in solitary without cause), any deputies who **denied him food, water, or showers**, and any staff who witnessed his suffering and did nothing. Additionally, any NCSO official who became aware of the DNA exoneration (for example, through internal communications or court filings) and yet failed to speak up or act on it, is responsible for the continued deprivation of

Plaintiff's liberty. These individuals acted under color of state law and violated clearly established rights of which a reasonable person would have known (e.g., the right to be free from conditions posing a substantial risk to an inmate's health, and the right not to be detained when obviously innocent).

59. **Injuries Suffered:** As a result of the actions and inactions of the NCSO Defendants, Plaintiff endured **significant injury**. The prolonged detention caused him ongoing loss of liberty and delayed his opportunity to clear his name. The harsh conditions inflicted physical discomfort (hunger, poor hygiene, lack of sleep) and severe psychological pain (anxiety, depression, feelings of hopelessness). The experience of being threatened and unprotected caused lasting emotional trauma. These injuries are compensable under § 1983.

60. **Punitive Damages:** The conduct of the Doe Defendants was not a mere accident or oversight; it was **reckless and oppressive**. To ignore a man rotting in jail when evidence says he doesn't belong there, and to treat him without basic compassion, is conduct that warrants punishment. Plaintiff therefore seeks **punitive damages** against the individual jail staff responsible, to hold them accountable and to discourage future jail officials from exhibiting similar indifference to human dignity.

### Count V – Municipal Liability (Monell Claim) – Failure to Train/Supervise and Unconstitutional Policies

### 42 U.S.C. § 1983 – Against Defendant City of Fernandina Beach

61. **Incorporation of Facts:** Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein. The constitutional violations suffered by Plaintiff were not isolated incidents of rogue individuals; rather, they were the **predictable result of**

**policies, practices, and customs** of the City of Fernandina Beach and its police department, and/or the City's failure to properly train and supervise its employees.

62. **Monell Liability Standard:** Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality like the City of Fernandina Beach can be held liable under § 1983 when an official policy or a widespread custom or practice of the city causes a violation of constitutional rights. Liability also attaches when the city's failure to train or supervise its employees in a relevant respect amounts to **deliberate indifference** to citizens' rights, and that failure to train is closely related to the ultimate injury. Here, the City is liable because the actions of FBPD officers that violated Plaintiff's rights were undertaken pursuant to (or were substantially caused by) the City's policies/customs, and by the City's lack of adequate training and supervision of police personnel.

63. **Policy or Custom of Hasty, Biased Investigations:** The City of Fernandina Beach, through its policymakers (including Police Chief Mark Foxworth), maintained an **unwritten custom or practice** of rushing to judgment in serious investigations, at the expense of suspects' constitutional rights. In cases of alleged sexual assault of a child, there was intense pressure on FBPD to make an immediate arrest and show the community that action was being taken. This pressure translated into a **custom of targeting convenient suspects without sufficient evidence**. In Plaintiff's case, as soon as the accusation was made, officers felt pressed to arrest someone (to show responsiveness), and Plaintiff – being the one identified by the child under suggestive circumstances – became the target. The **failure to thoroughly corroborate the accusation or wait for forensic results** was part of an institutional mindset that valued

speed over accuracy. Such a custom directly led to Plaintiff's false arrest and prosecution. It was **standard operating procedure** for FBPD to **credit accusations uncritically** and **neglect exhaustive evidence-gathering**, especially if they believed they "had their man." This custom is evidenced by, inter alia, the fact that FBPD did not interview all witnesses, did not properly consider alternate suspects, and charged ahead before DNA results – a pattern likely borne out by other cases and thus indicative of a broader practice.

64. **Failure to Train and Supervise (Fernandina Beach Police):** The constitutional violations were also caused by the City's **failure to adequately train and supervise** its officers and detectives in key areas of police work. The City's training deficiencies included the following:

a)    **Proper Investigation Techniques:** FBPD lacked proper training on conducting **thorough and unbiased investigations** of serious felonies. Officers were not adequately trained to **interview young children** in a non-leading manner, nor to handle sensitive allegations without contaminating witness memory or succumbing to confirmation bias. Had Detective Corbitt and colleagues been properly trained, they would have known to seek specialized assistance (e.g., child forensic interviewers) and to corroborate allegations with physical evidence before making an arrest. Instead, investigators proceeded with **confirmation bias**, a result of poor training and oversight.

b)    **Preservation and Consideration of Exculpatory Evidence:** The City failed to train officers on the **importance of exculpatory evidence** and their duty to disclose it. There was obviously a disconnect wherein officers and even

prosecutors ignored the FDLE report excluding Plaintiff. This suggests an institutional failure: either they were not trained to understand DNA evidence's significance, or they were not trained in their Brady obligations. Adequate training would have instilled that *any* evidence pointing to innocence must be taken extremely seriously and shared immediately – which did not happen here.

c)    **Probable Cause and Affidavit Integrity:** The City did not properly train officers on the **constitutionally required standard of probable cause** and the necessity for truthfulness in warrant affidavits. The fact that false statements and omissions appeared in Detective Corbitt's affidavit (and passed through Captain Peake's review) indicates a training and supervision lapse. A properly trained force would know that fabricating or omitting facts in a PC affidavit is a grave constitutional violation (and potentially a crime). The City's oversight mechanisms failed to catch or prevent this, evidencing **deliberate indifference** to such misconduct.

d)    **Supervisory Review and Case Screening:** The City's customs did not require meaningful supervisory review of major cases for probable cause before charges. Chief Foxworth and his command staff apparently rubber-stamped Detective Corbitt's findings instead of skeptically reviewing them. There was no policy ensuring, for example, that in a capital charge, forensic results must be obtained first, or that multiple detectives cross-verify crucial evidence. This lack of a proper check-and-balance system allowed Plaintiff's case – rife with red flags – to proceed unchecked, causing his wrongful arrest and jailing.

65.    **Deliberate Indifference of the City:** The City of Fernandina Beach knew or should have known that its lack of proper training and its tacit approval of hasty police work would lead to violations of citizens' rights. In fact, similar issues may have arisen in other cases (to be explored in discovery), putting the City on notice. Yet the City failed to act, demonstrating **deliberate indifference**. This deliberate indifference is evidenced by the egregious nature of the mistakes in this case (suggesting that officers were never taught or reminded of the correct protocols). The need for training in how to handle child sexual assault allegations (with care and corroboration) was obvious – these are sensitive, high-stakes cases prone to error – yet the City did not ensure its officers were equipped to handle them without trampling rights. The **moving force** behind Plaintiff's constitutional injuries was thus this lack of training and the Department's culture set by City policymakers.

66.    **Injury Caused by City's Policies/Customs:** Plaintiff's false arrest, prolonged detention, and related harms **resulted directly from the City's failures**. If FBPD had a policy to wait for DNA confirmation before charging, Plaintiff would not have been arrested when he was. If FBPD had trained its officers to thoroughly vet allegations and share exculpatory info, the case would have likely halted earlier (or never begun). The violation of Plaintiff's Fourth and Fourteenth Amendment rights is traceable to the **institutional decisions** of the City. Therefore, under § 1983 and Monell, the City of Fernandina Beach is liable to Plaintiff for his damages.

67.    **Relief Sought:** Under this Count, Plaintiff seeks **compensatory damages** from the City for the constitutional torts caused by its policies/customs (to the extent allowed by law – noting that punitive damages are not sought against the municipality).

Plaintiff also seeks **appropriate injunctive relief** against the City, such as a court-ordered mandate that FBPD implement new training programs (e.g., on handling of exculpatory evidence and avoiding wrongful arrests) and policy revisions (for example, requiring higher-level review of any case that relies solely on a child's uncorroborated allegation). These measures are needed to prevent future violations. Additionally, Plaintiff seeks **attorneys' fees** and costs under 42 U.S.C. § 1988 against the City if he prevails.

### Count VI – Municipal Liability (Monell Claim) – Unconstitutional Detention Policies/Practices

**42 U.S.C. § 1983 – Against Defendant Nassau County Sheriff's Office (NCSO)**

68. **Incorporation of Facts:** Plaintiff incorporates all preceding paragraphs here. This Count addresses the liability of the Nassau County Sheriff's Office for the violations of Plaintiff's rights that occurred in the jail and through the policies of detention.

69. **Role of NCSO as Policymaker:** The Sheriff of Nassau County (through NCSO) is the official policymaker for the operation of the county jail and the treatment of detainees. Thus, NCSO's policies, practices, and customs in running the jail are attributable to the County for § 1983 purposes (this is effectively a claim against the County via the Sheriff's Office). Plaintiff alleges that **unconstitutional policies or customs** of NCSO were a moving force behind the prolonged and punitive nature of his pretrial detention.

70. **Policy/Custom of Ignoring Exculpatory Developments:** NCSO maintained a **policy or custom of not re-evaluating or facilitating the release of pretrial detainees even when credible evidence of their innocence emerges**. In other words, once someone was locked up pretrial, the jail's attitude (policy) was to "let the courts sort it out" eventually, with no internal mechanism to flag cases where the factual basis for

detention had eroded. This institutional inertia meant that, as in Plaintiff's case, even if a lab result or new evidence showed the detainee likely didn't commit the crime, NCSO would **do nothing** – no communication up the chain, no alert to a judge or prosecutor. Such a policy of **deliberate indifference to exculpatory evidence** resulted in Plaintiff's continued detention for months with no action. A reasonably run jail system would have a procedure, for instance, where if a major piece of exonerating evidence comes in (like DNA excluding the inmate), the jail administration contacts the State Attorney or the court to ensure they are aware, or at least reviews whether the inmate can be moved to less restrictive custody. The absence of any such procedure at NCSO led to Plaintiff's rights being ignored.

71. **Failure to Train Jail Staff on Detainee Rights:** Similarly, NCSO **failed to train its jail staff and supervisors** on the constitutional rights of pretrial detainees and how to uphold them. The jail officers were evidently not trained (or not instructed in practice) to avoid punitive treatment of detainees. The routine use of **solitary confinement without due cause** suggests a training/custom issue – it was perhaps standard to isolate those accused of certain crimes as a one-size-fits-all measure, without regard to the psychological harm or whether less harsh alternatives existed. Additionally, the **neglect of inmates' basic needs** (food, water, safety) indicates a lack of training in humane jail management. Officers were either not trained to recognize when denying a shower or a meal becomes a constitutional violation, or worse, the culture tolerated such lapses. The pattern of Plaintiff's treatment implies this was **not an aberration**, but rather reflective of how that jail was run – pointing to an underlying custom of **indifference and perhaps hostility toward inmates**, especially those accused of

heinous offenses. NCSO's leadership allowed this culture to persist, amounting to deliberate indifference in training and supervision.

72. **Policy of Inadequate Jail Conditions:** Furthermore, Nassau County (through NCSO) had policies that resulted in **inadequate jail conditions** in general – for example, understaffing leading to neglect, or a lack of proper protocols to protect vulnerable detainees from other inmates. If Plaintiff was threatened and officers didn't respond, that may be due to a policy of ignoring verbal threats until actual violence occurs, which is inherently inadequate. If meals were missed, perhaps due to staffing or cost-saving measures, that's a policy choice that affected detainee welfare. These structural issues in policy contributed to the specific harms Plaintiff suffered (like hunger and fear for his safety).

73. **Deliberate Indifference of NCSO:** The NCSO (and by extension, Nassau County) was **deliberately indifferent** to the foreseeable risk that its policies or lack of training would violate detainees' rights. It is well-known (and obvious) that solitary confinement can cause serious harm, that detainees rely on staff for necessities, and that continuing to hold someone who might be innocent poses moral and legal issues. Yet NCSO didn't implement safeguards. This indifference is evidenced by the severity of what happened to Plaintiff and possibly others – indicating no one in charge made efforts to prevent such treatment. The pattern of neglect in Plaintiff's case suggests it was condoned at higher levels.

74. **Causation and Injuries:** The **policies and customs** described above were the moving force behind the violations of Plaintiff's Fourteenth Amendment rights (as described in Count IV). But for NCSO's systemic failures, Plaintiff's detention conditions would

not have been as punitive or prolonged. His injuries – psychological trauma from solitary confinement, physical discomfort from neglect, and the extended time in jail – are directly linked to these municipal failures. For example, had NCSO trained guards to treat pretrial inmates humanely, those guards might not have mistreated Plaintiff. Had NCSO had a policy to alert the prosecutor of the DNA result, maybe the case's resolution would have accelerated. Thus, Nassau County (via NCSO) bears responsibility for the harm inflicted on Plaintiff.

75. **Relief Sought:** Under this Count, Plaintiff seeks to hold NCSO (and thus Nassau County) liable for **all compensatory damages** arising from the jail-related constitutional violations. While punitive damages cannot be recovered from the municipality, the availability of **municipal liability ensures** that Plaintiff can obtain full relief for his injuries even if individual jailers are unidentified or immune. Additionally, Plaintiff requests **injunctive relief** requiring NCSO to reform its detention policies – for instance, to implement training on detainee rights, to regulate the use of solitary confinement, and to create a procedure for reviewing continued detention in light of new evidence. Such relief is appropriate to prevent future harm to others. Plaintiff also seeks his **attorneys' fees** and costs under 42 U.S.C. § 1988 for having to bring this action to vindicate his rights.

### Count VII – Negligence (State Law) – Negligent Investigation

*(Against Defendant City of Fernandina Beach, based on acts of FBPD officers; **Fla. Stat. § 768.28** waiver of sovereign immunity))*

76. **Incorporation of Facts:** Plaintiff incorporates all prior allegations to the extent they are applicable to this claim. This Count is pleaded in the alternative to the § 1983 claims, addressing the **negligence** of law enforcement personnel in the investigation

that led to Plaintiff's arrest, for which the City of Fernandina Beach is vicariously liable under Florida law.

77. **Duty of Care in Police Investigation:** Under Florida law, law enforcement officers owe a duty of care to the public (including suspects) when conducting an investigation, particularly to avoid foreseeable injury through negligent acts. Here, once the FBPD chose to investigate and arrest Plaintiff, a **"special duty"** arose toward him to conduct that investigation with reasonable care so as not to cause wrongful arrest and imprisonment. This duty is grounded in the notion that a careless or botched investigation can foreseeably cause harm to an innocent person. Florida recognizes that police work, while often discretionary, can give rise to liability if officers fail to exercise due care in carrying out operational tasks (as opposed to policy-level decisions). In this case, the tasks of interviewing witnesses, gathering evidence, and determining probable cause were operational activities that should have been done non-negligently.

78. **Breach of Duty by FBPD Officers:** The City of Fernandina Beach, through the actions of its employees (the FBPD officers and detectives), **breached the duty of care** owed to Plaintiff in multiple ways. The investigation into the alleged sexual battery was handled **negligently** and below the standard of care that a reasonably prudent law enforcement agency would use. The breaches include:

a) **Failing to Interview Key Witnesses:** Officers did not interview all adults and children present at the gathering, missing out on accounts that might have contradicted or contextualized the accusation. A reasonable investigation would have canvassed everyone (e.g., did anyone see Plaintiff interact with the child?

Did anyone see anyone else follow her?). By neglecting basic investigatory steps, the officers breached their duty.

b) **Ignoring Exculpatory Evidence:** As established, officers **ignored clear exculpatory evidence** – most notably the DNA results excluding Plaintiff, but also the victim's initial statements that pointed away from Plaintiff and the presence of another possible suspect. A reasonably careful officer would have given great weight to evidence of innocence and certainly would not push forward once lab results came back negative. The failure to appropriately value and act on such evidence was negligent.

c) **Premature Arrest Without Corroboration:** The officers arrested Plaintiff on an extremely serious charge **without corroborating the accusation** (no eyewitness, no physical evidence linking him) and even before the forensic testing was done. This rush to arrest was a breach of duty – a prudent officer would at least wait for critical test results in a case hinging on fluid evidence. By arresting Plaintiff with scant evidence, the officers did not act as reasonable officers would under similar circumstances.

d) **Misidentification and Confirmation Bias:** The manner in which the investigation zeroed in on Plaintiff – including potentially suggestive procedures in obtaining the child's identification of Plaintiff (e.g., having the child walk out and point, which may have been guided by the father) – was negligent. Standard police protocols exist for **proper suspect identification** (like formal lineups or photo arrays conducted fairly), yet the officers relied on an impromptu show-up

identification by a 5-year-old, which is inherently unreliable. Such negligent methods increased the risk of a false accusation.

e)    These acts and omissions by FBPD were not exercises of protected discretion but rather failures in ordinary care during an investigation, which Florida tort law deems "operational" negligence.

79. **Causation:** The City's negligence in investigating was a **proximate cause** of Plaintiff's damages. But for the sloppy and reckless police work, Plaintiff would not have been arrested and charged. If the investigation had been done properly – interviewing all witnesses, weighing exculpatory evidence, waiting for DNA confirmation – it is likely that no charges would have been filed against Plaintiff at all, or they would have been dropped much sooner. The direct result of the negligent investigation was the **wrongful arrest and prosecution** of Plaintiff, leading to his incarceration and all related harms. These outcomes were not only foreseeable, they were the natural consequence of building a case on unreliable information.

80. **Damages:** As a result of the City's negligence through its officers, Plaintiff suffered the harms previously described: nearly nine months of imprisonment, emotional distress, lost income and employment, legal expenses, and reputational damage. In Florida, a public entity can be held liable for such damages up to the statutory caps (currently $200,000 per claim, unless a claims bill is pursued), pursuant to the waiver of sovereign immunity in **Fla. Stat. § 768.28**.

81. **Vicarious Liability and 768.28 Compliance:** At all relevant times, the FBPD officers (Corbitt, Ennis, etc.) were acting within the course and scope of their employment with the City of Fernandina Beach. Therefore, under Fla. Stat. § 768.28(9)(a), the City is

**vicariously liable** for their negligent acts or omissions. Plaintiff has satisfied any pre-suit requirements of § 768.28(6) (including providing written notice to the Florida Department of Financial Services and the City) or will have satisfied them by the time of trial. (If such notice was not fully given before filing, this Complaint will be amended or the proceedings stayed to allow compliance, as § 768.28 is not intended to bar meritorious claims.) Accordingly, the City of Fernandina Beach can be held responsible in this Court for the state-law negligence of its employees, under this Court's supplemental jurisdiction (28 U.S.C. § 1367).

82. **No Immunity for Negligence:** The conduct alleged in this Count (negligent investigation) is considered an "operational" act, not a "planning" or discretionary policy decision protected by sovereign immunity. Florida law permits suits for negligence in law enforcement activities when officers fail to follow proper procedures and someone is harmed as a result. Thus, no exception to liability applies that would shield the City from this claim.

**Count VIII – Negligence (State Law) – Negligent Supervision/Detention**

*(Against Defendant Nassau County Sheriff's Office (NCSO), based on acts of NCSO jail staff; Fla. Stat. § 768.28))*

83. **Incorporation of Facts:** Plaintiff incorporates all previous allegations to the extent relevant. This state-law negligence claim concerns the **breach of duties by jail officials** during Plaintiff's incarceration, for which the Nassau County Sheriff's Office (or Nassau County via the Sheriff) is liable under Florida law.

84. **Duty of Care in Jail Operations:** The Sheriff's Office and its deputies owed Plaintiff a duty to exercise reasonable care for his safety and well-being while he was in custody. Under Florida law, jailers have an obligation to **safeguard inmates** (protect them from

undue harm, provide basic necessities) and to **avoid subjecting inmates to conditions that amount to unnecessary suffering**. Because an incarcerated person is wholly dependent on jail staff for survival and safety, the law imposes on the custodians a duty to act reasonably to ensure the inmate is kept secure and healthy. This includes duties such as providing food, water, medical care, safe housing, and not unreasonably inflicting solitary confinement without cause.

85.  **Breach of Duty by NCSO Staff:** NCSO, through the actions of its jail staff (deputies, supervisors, etc.), **breached the duty of care** owed to Plaintiff in several respects:

a)  **Negligent Denial of Basic Needs:** Jail staff failed to consistently provide Plaintiff with **food and water**, as there were instances where he did not receive meals or hydration in a timely manner. A reasonable jail would have protocols to ensure no inmate is skipped or denied meals absent a disciplinary or medical reason (and even then, alternatives must be provided). Skipping Plaintiff's meals or giving inedible food breached the standard of care for inmate nutrition.

b)  **Unsafe Housing Assignment:** Placing Plaintiff (an accused sex offender, highly vulnerable in jail hierarchy) in situations where other inmates could threaten him was negligent. While protective custody was ostensibly provided, it was done in a manner that caused more harm (solitary confinement without proper monitoring). Either the decision to use solitary was negligent (if unnecessary), or if necessary, the conditions of that confinement (no out-of-cell time, no monitoring of his mental state) were negligent. Moreover, allowing threats to go unaddressed – essentially **failing to protect** Plaintiff – breached the duty to keep him safe.

c)   **Negligent Supervision and Observation:** Jail staff likely failed to properly supervise Plaintiff's well-being. For example, leaving someone in isolation for days without meaningful human contact or monitoring is dangerous. Reasonable care would involve regular mental health checks or evaluations for an inmate in solitary, as well as promptly responding to inmates' grievances or requests (like Plaintiff's pleas for a shower or to report threats). Ignoring Plaintiff's requests or signs of distress was a breach of the duty to supervise inmates responsibly.

d)   **Extended Detention Without Review:** While the decision to hold Plaintiff was based on a court order (the bail), the **jail's failure to initiate or suggest any review when evidence of innocence came** was arguably negligent from an administrative standpoint. It may be a novel argument, but one could say that a reasonable jail administration would, upon learning of exonerating DNA, consult with legal counsel or the court about the inmate's status. NCSO's total passivity contributed to unnecessary harm (time in jail). If such a duty is recognized, NCSO breached it by not taking any action, however minimal, to prevent continued wrongful confinement.

86.   **Scope of Employment and Vicarious Liability:** At all times, the jail deputies and staff were acting within the scope of their employment with NCSO. Under Fla. Stat. § 768.28, Nassau County (via the Sheriff's Office) is **vicariously liable** for the negligent acts of its employees. This is not a claim of intentional misconduct (which would be excepted by § 768.28(9)); rather, it is a claim that the staff failed to use reasonable care. Thus, sovereign immunity is waived for this operational negligence in the custody of inmates.

87. **Causation:** The negligence of NCSO staff was a **legal cause** of damage to Plaintiff. Because they failed to feed him properly, Plaintiff experienced hunger, weakness, and health issues (physical and mental). Because they kept him in solitary and ignored him, Plaintiff suffered severe psychological harm (anxiety, depression). Because they didn't intervene about the threats, Plaintiff lived in constant fear for his life. These harms were foreseeable results of the staff's negligence. Additionally, the **length** of time Plaintiff spent incarcerated (even after evidence showed his innocence) was exacerbated by the jailers' inaction – had someone at the jail raised a concern or facilitated communication about the DNA, who knows if that might have sped up his release by prompting prosecutorial action? At minimum, their negligence deprived Plaintiff of any chance of earlier relief.

88. **Damages:** Plaintiff suffered damages including **physical discomfort** (from lack of food/water and poor living conditions), **mental anguish** (from isolation, fear, and uncertainty), and **other losses** (the continued incarceration leading to loss of job, etc., though those overlap with other counts). Under Florida law, Plaintiff is entitled to recover compensatory damages for these negligence-induced injuries. This may include medical expenses for treatment of mental health issues arising from his confinement, and pain and suffering damages for the period of mistreatment.

89. **Compliance with Notice:** To the extent required, Plaintiff has complied with the pre-suit notice provisions of Fla. Stat. § 768.28(6) by notifying the Department of Financial Services and NCSO of his claim, or such notice will be satisfied as permitted by law (acknowledging that Plaintiff's detention ended in 2022, so notice within 3 years and suit thereafter is timely).

90. **No Sovereign Immunity Bar:** The negligent acts described – feeding, housing, monitoring inmates – are operational-level functions of jail personnel. Florida courts have held that while the decision to incarcerate someone is discretionary, the **day-to-day care of inmates** is operational and subject to negligence claims. Therefore, NCSO (the County) is not immune from this suit and must answer for the negligence of its jail staff.

91. **Vicarious Liability vs. Individual Liability:** Plaintiff is not, at this time, pursuing the individual jail employees for negligence (as many are unidentified John Does, and also because § 768.28(9) makes the government entity the proper defendant for ordinary negligence of employees). Thus, **NCSO is the defendant responsible** for paying any judgment on this Count. Any suggestion that an individual acted in bad faith or with malicious purpose (which would take it out of § 768.28's waiver) is not a part of this negligence claim – those facts support the federal claims but here Plaintiff pleads in the alternative that if the conduct was not intentional, it was certainly negligent.

92. **Relief Sought:** On this Count, Plaintiff seeks a judgment for money damages against NCSO (up to the amounts permitted by law, or beyond if a claims bill is pursued) to compensate him for the harm suffered due to the negligent detention practices. This includes damages for emotional distress, physical pain, and any economic losses attributable to the extended and harsh incarceration. Plaintiff also seeks the costs of this action and any other relief available under Florida law for the negligence claim. *(Attorneys' fees are not directly recoverable for a state tort, except as may be allowed by any proposal for settlement or other statute, so the main fee claim remains under federal law § 1988.)*

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff **Giovaniel Soto-Valentín** prays that the Court grant him relief as follows:

A. **Compensatory Damages:** An award of **compensatory damages** against all Defendants, jointly and severally as allowed by law, in an amount to fully compensate Plaintiff for the injuries he has suffered. This includes damages for **loss of liberty** (for the time he was wrongfully imprisoned), **physical pain and discomfort**, **emotional distress and mental anguish**, **reputational harm**, **lost income and earnings capacity**, and all other actual harms proven at trial.

B. **Punitive Damages:** An award of **punitive damages** against each of the individual Defendants in their personal capacities (not against the municipal entities) to punish and deter the kind of egregious misconduct described herein. Plaintiff seeks punitive damages in an amount sufficient to hold these Defendants accountable for acting with malice, willfulness, or reckless indifference to Plaintiff's constitutional rights.

C. **Declaratory Relief:** A **declaratory judgment** that the acts and practices of the Defendants **violated Plaintiff's rights** under the U.S. Constitution (specifically the Fourth, Eighth, and Fourteenth Amendments) and under Florida law. Such a declaration will serve to clear Plaintiff's name and establish the wrongful nature of Defendants' conduct.

D. **Injunctive Relief:** Appropriate **injunctive relief** requiring the relevant government entities to implement reforms to prevent similar incidents in the future. This may include, but is not limited to: **policy changes and training** within the Fernandina Beach Police Department (e.g., mandating thorough investigation techniques,

45

evidence disclosure, and checks on probable cause before arrest); and **policy changes within the Nassau County Sheriff's Office** (e.g., improved training of jail staff on inmate rights, limitations on the use of solitary confinement for pretrial detainees, and procedures to flag cases with exonerating evidence). The injunction should also require periodic reporting or monitoring to ensure compliance with these reforms.

E.    **Attorneys' Fees and Costs:** An award of **reasonable attorneys' fees and litigation costs** incurred by Plaintiff in pursuing this action, pursuant to 42 U.S.C. § 1988 (for the § 1983 claims) and any other applicable fee-shifting provisions. Given that Plaintiff has had to fight to vindicate fundamental rights, he is entitled to recover the costs of bringing this lawsuit to justice.

F.    **Such Other Relief as the Court Deems Just and Proper:** Any further relief that the Court deems just, equitable, and proper, including but not limited to **pre-judgment and post-judgment interest** on any monetary award, and any necessary or appropriate **equitable relief** within the Court's power to grant (such as orders expunging any record of the false charges against Plaintiff).

### JURY TRIAL DEMAND

Plaintiff **demands a trial by jury** on all issues so triable as a matter of right.

Each and every Defendant is hereby put on notice that Plaintiff seeks a jury determination of his claims and the quantum of damages.

Respectfully submitted, in Jacksonville, Florida, on this the 2nd day of September 2025.


*s/Edwin Prado-Galarza*
Attorney at Law
Prado Law Offices
111 N Orange Ave suite 800

Orlando FL 3201
T. (787) 977-1411
pradolaw10@gmail.com
Florida Bar No. 1008115